## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | 8:18-cv-1003-T-23TGW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DIANE J. HARRISON, MICHAEL J. DANIELS, and CATHERINE A. BRADAICK-ZOLLA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| 5 DOGS, INC., | ) | |
| | ) | |
| Relief Defendant. | ) | |
| _____ | ) | |

### COMPLAINT

Plaintiff Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges:

### I. INTRODUCTION

1.    The Commission brings this action to enjoin Defendants Diane J. Harrison ("Harrison"), Michael J. Daniels ("Daniels"), and Catherine A. Bradaick-Zolla ("Bradaick") from violating the antifraud, registration, and/or reporting provisions of the federal securities laws.

2.    From no later than July 2010 through August 2014, Harrison participated in two separate fraudulent schemes to manufacture public companies for sale fundamentally premised on a deceptive public float of purportedly "free-trading" securities.  The creation of



that deceptive public float was dependent on false and misleading statements and omissions to the Commission, the Financial Industry Regulatory Authority (FINRA), the Depository Trust Company (DTC), and others regarding, among other things, the purpose, officers, shareholders, and control persons of the companies.

3.      In the first scheme, Harrison and her husband, Daniels, manufactured at least five public companies: Dinello Restaurant Ventures, Inc. n/k/a/ AF Ocean Investment Management Company ("Dinello/AF Ocean"); Court Document Services, Inc. n/k/a ChinAmerica Andy Movie Entertainment Media Company ("Court/ChinAmerica"); Quality Wallbeds, Inc. n/k/a Sichuan Leaders Petrochemical Company ("Wallbeds/Sichuan"); Top to Bottom Pressure Washing, Inc. n/k/a Ibex Advanced Mortgage Technology, Inc. ("TTB/Ibex"); and PurpleReal.com Corp. ("PurpleReal") (collectively, the "Harrison/Daniels Companies").

4.      Harrison and Daniels created the Harrison/Daniels Companies with the undisclosed intent to sell them primarily for their status as public companies with a pool of securities purportedly available for public trading.

5.      Harrison and Daniels' scheme followed a consistent pattern.  Daniels and Harrison acquired a small local business and gifted its privately-held securities to approximately 30 friends and family by providing them with all the money to "purchase" the shares, to give the false appearance they had actually invested in the companies.  Daniels and Harrison prepared, and Harrison then filed, a registration statement on Form S-1 with the Commission to register a sham secondary public offering of the shares (when they had already planned to effectuate a bulk transfer of the shares in a materially different manner).

2

Daniels and Harrison used the identity of a friend (sometimes without his or her knowledge) to be a fellow officer to create a mirage of not just independent investors, but also independent management. Each registration statement made false and misleading statements concerning the officers, the company's business purpose, and the "selling" shareholders.

6.      Daniels and Harrison then orchestrated filings with FINRA and DTC for the shares in the registered offering to be eligible for open-market trading and electronic clearing. Harrison and Daniels failed to disclose in any filings with the Commission, FINRA or DTC their intent at all material times to manufacture the Harrison/Daniels Companies as public vehicles and their control over all of their issued securities.

7.      Daniels and Harrison sold four of the Harrison/Daniels Companies to Andy Z. Fan for up to $500,000 each by transferring all or nearly all of the shares of the companies to Fan or his designees pursuant to false shareholder representation letters, agreements and legal opinion letters. Daniels made his "business model" clear to Fan in a series of emails: Daniels would acquire a local business and keep it barely operational "while we go through our process," use "friendly" shareholders with whom they "will have no problems," deliver their shares upon paying them a pre-determined price, and make trades in the open market at artificial prices.

8.      In fact, Harrison and Daniels continued to support Fan: Daniels and Harrison prepared false Commission filings, Harrison submitted false legal opinion letters, and Daniels entered manipulative trades to artificially raise the price of the stocks through at least May 2014.

3

9.      Bradaick was an officer of one of the Harrison/Daniels Companies, was a straw shareholder in all of the Harrison/Daniels Companies, and otherwise assisted Harrison and Daniels in the manufacture of four Harrison/Daniels Companies. Bradaick knew – or was at least reckless in not knowing – that the purpose of the Harrison/Daniels Companies was to be sold as public vehicles, yet took a variety of actions in furtherance of Harrison and Daniels' scheme to conceal that purpose in order to develop the Harrison/Daniels Companies for sale based on the deceptive public float of securities.

10.     Daniels used Relief Defendant 5 Dogs, Inc. ("5 Dogs") as a conduit to receive and disburse the funds derived from his actions in connection with the Harrison/Daniels Companies.

11.     Separately, Harrison participated in a scheme with Alvin S. Mirman ("Mirman") and Sheldon R. Rose in which at least 11 undisclosed "blank check" companies as defined in Rule 419 under the Securities Act of 1933 ("Securities Act") were manufactured for sale by reverse merger with a deceptive public float of purportedly unrestricted securities (the "Mirman/Rose Companies").

12.     Harrison, a securities law attorney, acted as Mirman and Rose's primary attorney in furtherance of the scheme. Harrison prepared at least 21 legal opinion letters with respect to the valid issuance and unrestricted nature of the securities of the Mirman/Rose Companies all at the direction, and for the primary benefit, of Mirman and Rose. Harrison provided these professional services throughout the process knowing – or being reckless in not knowing – about both the fraud and falsity of her statements. With the participation and substantial assistance of Harrison, Mirman and Rose sold 9 of the Mirman/Rose Companies.

13.     As a result of the conduct alleged in this Complaint:

(a)     Defendant Harrison violated Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a), and Section 10(b) and Rules 10b-5 and 13a-14 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and 17 C.F.R. §§ 240.10b-5, 240.13a-14; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), and Sections 10(b) and 13(a) and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13a-14 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78m(a), and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13a-14;

(b)     Defendant Daniels violated Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), and Sections 9(a)(1), 9(a)(2) and 10(b) and Rules 10b-5 and 13a-14 of the Exchange Act, 15 U.S.C. §§ 78i(a)(1), 78i(a)(2), 78j(b), and 17 C.F.R. §§ 240.10b-5, 240.13a-14; and aided and abetted violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13a-14 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13 and 240.13a-14;

(c)     Defendant Bradaick aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and of Sections 9(a)(1), 9(a)(2) and 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. §§ 78i(a)(1), 78(a)(2), and 78j(b) and 17 C.F.R. § 240.10b-5; and

(d)     Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

14.     The Commission therefore respectfully requests the Court enter an order: (i) permanently restraining and enjoining Defendants from violating the federal securities laws;

5

(ii) directing Defendants and Relief Defendant to pay disgorgement with prejudgment interest; (iii) directing Defendants to pay civil money penalties; (iv) imposing penny stock bars against Defendants; and (v) imposing officer and director bars against Defendants.

## II. **DEFENDANT, RELIEF DEFENDANTS, AND OTHER RELEVANT PERSONS**

### A. **DEFENDANTS**

15.     **Harrison**, age 59, of Palmetto, Florida, was the Chief Financial Officer, Secretary, Treasurer and Director of Dinello/AF Ocean from July 2010 to July 2013, Treasurer, Principal Accounting Officer and Director of Wallbeds/Sichuan from December 2012 to August 2013, Director and Secretary of TTB/Ibex from May 2014 to October 2014, and President, Director, and Chairman of the Board of PurpleReal from January 2014 to the present. Harrison, a licensed attorney in Florida and Nevada, is the owner of the law firm Harrison Law, PA, which is based in Florida.

16.     **Daniels**, age 71, of Palmetto, Florida, was the undisclosed control person of Dinello/AF Ocean, the President, Chief Executive Officer, and Chairman of the Board of Court/ChinAmerica from January 2012 to October 2012, Chief Financial Officer, Treasurer and Director of Court/ChinAmerica from January 2012 to December 2013, and Secretary of Court/ChinAmerica from October 2012 to December 2013, the Principal Executive Officer, Secretary, Treasurer, Chairman of the Board, Principal Accounting Officer, and Chief Financial Officer of Wallbeds/Sichuan from March 2012 to December 2012, the Secretary, Chief Financial Officer, Treasurer, Director, and Chairman of the Board of TTB/Ibex from November 2012 to December 2013, and a shareholder and undisclosed control person of PurpleReal.

17.    **Bradaick,** age 50, of Sarasota, Florida, was the President of Wallbeds/Sichuan from March 2012 to December 2012, a shareholder of each of the Harrison/Daniels Companies, and an employee of Dinello/AF Ocean.

## B. RELIEF DEFENDANT

18.    **5 Dogs, Inc.** ("5 Dogs") is a Florida corporation located in Parrish, Florida. Harrison and Daniels are the officers and directors of 5 Dogs.

## C. OTHER RELEVANT PERSONS

19.    **Mirman,** age 77, of Sarasota, Florida, was, along with Rose, the undisclosed control person of the Mirman/Rose Companies. Mirman was a defendant in SEC v. McKelvey et al., Case No. 15-cv-80496 (S.D. Fla. 2015), in which the Court entered a judgment of permanent injunction, officer and director bar and penny stock bar against Mirman by consent. On July 28, 2016, Mirman was criminally charged by information with conspiracy to commit securities fraud, and was ultimately sentenced to 12 months imprisonment. U.S. v. Mirman et al., Case No. 16-cr-20572 (S.D. Fla.). Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.

20.    **Rose,** age 76, of Sarasota, Florida, was, along with Mirman, the undisclosed control person of the Mirman/Rose Companies. The Commission entered a cease-and-desist order, officer and director bar and penny stock bar against Rose, In re Sheldon Rose et al., Exch. Act Rel. No. 78894 (Sept. 21, 2016), required Rose to pay disgorgement and prejudgment interest in the amount of $2,973,916.18 which was deemed satisfied upon entry of an order of restitution or forfeiture in his related criminal case. In re Sheldon Rose, Exch.

Act Rel. No. 80301 (Mar. 23, 2017). On September 21, 2016, Rose was criminally charged by information with conspiracy to commit securities fraud, and was ultimately sentenced to 40 months imprisonment. <u>U.S. v. Kass et al.</u>, Case No. 16-20706 (S.D. Fla.). Both the Commission and criminal actions include his misconduct in connection with the Mirman/Rose Companies.

### III. JURISDICTION AND VENUE

21.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a).

22.     The Court has personal jurisdiction over Defendants and Relief Defendant and venue is proper in this District because, among other things, some or all of the Defendants and Relief Defendant reside or transact business in this District and/or participated in the offer, purchase, or sale of securities in this District, and many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

23.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

8

## IV. FACTUAL ALLEGATIONS

### A.    The Harrison and Daniels Shell Factory

24.    Daniels and Harrison's shell factory followed a consistent pattern.  For the first four Harrison/Daniels Companies, Harrison and Daniels used a small local business as a purported business plan and operations, 29 friends and family as purported shareholders, and a friend as a purported second officer to conceal their manufacture of issuers for sale purely for their public status.  In Daniels' own words, these facades were carefully orchestrated to avoid being "labeled as a 'shell mill.'"

### 1.    Dinello/AF Ocean

25.    In 2010, Daniels and Harrison acquired a local pizzeria through the purchase of the company stock in the names of 29 friends and family.  Daniels sent the friends and family all the money for them to obtain cashier's checks as the purported consideration for the stock.  Harrison and a friend of Daniels for over 20 years who was then residing in Land O Lakes, Florida (hereinafter referred to by his first and last initials, "J.P."), were named as the officers of Dinello/AF Ocean in 2010.

26.    By email dated November 30, 2010, a friend of Harrison who was then residing in Seminole, Florida (hereinafter referred to by his first and last initials, "M.E.") asked Harrison if regulators would have concern if his wife "creates another public company."  Harrison, who had previously acted as an officer of Cheetah Consulting, Inc., responded: "We are filing [Dinello/AF Ocean] under my name and it has been two years since Cheetah's acquisition."

9

27.    In February 2011, Daniels and Harrison filed a Form S-1 registration statement for a purported secondary offering of the friends-and-family shares. Dinello/AF Ocean's Form S-1 misrepresented that the friends and family had invested in the company (whereas they had been gifted the shares), its business purpose was the operation of a pizza business with no anticipated change to the business plan in the next year (whereas Daniels and Harrison always planned to sell the entity as a public vehicle), and J.P. was spending 40 hours per week on the business (whereas J.P. spent no time on Dinello/AF Ocean).

28.    The Dinello/AF Ocean Form S-1 and subsequent periodic reports (Forms 10-K, 10-Q, and 8-K) through August 2011 contained the electronic signature of J.P., who never received or signed any Commission filing, and contained six officer certifications required by the Sarbanes-Oxley Act of 2002 with the electronic signature of J.P. (two dated each of May 6, 2011, August 15, 2011 and August 16, 2011). The certifications stated that J.P. had reviewed the periodic report (which he had not), based on his knowledge the periodic report does not contain any untrue statement of material fact or omission (whereas he had no such knowledge), and J.P. was involved in designing and evaluating disclosure controls and procedures and internal controls over financial reporting for Dinello/AF Ocean (which he had not). Daniels and Harrison drafted the periodic reports containing the certifications in the name of J.P., which Harrison forged. J.P. was not aware that his electronic signature had been placed on these periodic reports and accompanying certifications.

29.    The Dinello/AF Ocean periodic reports also included officer certifications by Harrison which falsely stated that Harrison was unaware of any material misstatements or

omission in the periodic reports and that the financial information in the reports fairly represented the financial condition of the issuer.

30.    In May 2011, Harrison retained a broker-dealer to file a Form 211 application with FINRA in order for Dinello/AF Ocean shares to obtain a ticker symbol and be quoted for public trading. The Form 211, including the responses to FINRA's deficiency letters, contained similar misrepresentations with respect to the management, business purpose, and shareholders of Dinello/AF Ocean to give the false appearance of an operating company with a specific business plan (i.e. no plans to seek a merger or acquisition), independent management and an independent shareholder base.

31.    In fact, Daniels was looking to sell Dinello/AF Ocean as a public vehicle even before FINRA cleared the Dinello/AF Ocean Form 211. By email dated June 15, 2011, Daniels wrote to an acquaintance: "Check out DNLO! We had three comments from FINRA and done. Finishing DTC now. Looking to make a good acquisition. . . . We are going to be looking for top dollar since we are a fully operating company with no shell issues." Harrison and Daniels began to prepare all the securities of Dinello/AF Ocean for transfer in such an acquisition. For example, letters were addressed in the name of Harrison to the friends and family shareholders dated August 25, 2011, requesting them to execute blank stock powers and keep the certificate in a safe place: "You will receive further instructions on how to redeem this certificate for cash."

32.    Daniels and Harrison were then introduced to Fan as a prospective buyer of public companies. In September 2011, Harrison (as Chairperson and majority shareholder) and Fan signed a stock purchase agreement whereby almost all of Dinello/AF Ocean's 3.2

million shares, including all but 3,000 of the Form S-1 shares in the names of the friends and family, were sold to "Fan and/or his designees/assigns" for $500,000 all to be paid by Fan. The stock purchase agreement provided that Fan would be appointed as a Director, and specified that the sale was of the "Corporate Entity only and does not include any of the assets." The agreement identified Fan's designees as two Chinese citizens with initials J.Z. (hereinafter "Designee 1") and G.S. (hereinafter "Designee 2").

33.     As another step in the fraudulent scheme, Daniels purportedly purchased the Dinello/AF Ocean shares in the name of one of his friends.  In depositing his shares in October 2011 with a broker-dealer, Daniels misrepresented that, among other things, he and his friend were not "affiliates" of Dinello/AF Ocean despite the fact that Daniels (and his wife, Harrison) controlled all aspects of Dinello/AF Ocean and its securities through at least September 15, 2011.  Later that month, Daniels sold some shares in the open market at $0.51 per share to restore DTC eligibility for Dinello/AF Ocean stock.

34.     Weeks after having sold virtually all Dinello/AF Ocean shares to Fan per the stock purchase agreement, Harrison signed letters to the friends and family shareholders that Fan's designee "asked that I extend to you his offer" (despite Harrison having no direct communication with the designee) to purchase all but 100 (the specified number in the stock purchase agreement) of their shares for $500, with a check from Harrison's trust account enclosed.  Whereas Daniels had just sold shares in the open market at $0.51 per share and the Form S-1 provided for a $0.10 per share fixed price offering, the friends and family received only approximately $0.03 per share.

12

35.     Harrison's letter instructed the friends and family to sign two documents: (1) an Acceptance Agreement, which stated that "I am not selling my shares in conjunction with any other person" and "there has been no influence exerted over me by any officer or director of the company regarding the sale of my shares;" and (2) a Shareholder Representation Letter that he or she is not an affiliate, the shares are not part of any distribution, and Dinello/AF Ocean is not a "'blank check' or 'shell' company." To the contrary, Harrison had already committed to the bulk transfer of virtually all the friends-and-family shares via the stock purchase agreement with Fan.

36.     In September and October 2011, Dinello/AF Ocean filed Forms 8-K misrepresenting the "voluntary resignation" of J.P. as due to time constraints, misleadingly announcing the appointment of Fan as Director, Chairman of the Board and President, and misrepresenting that Dinello/AF Ocean was undergoing a change in business strategy "due to the current economic conditions.". The Forms 8-K omitted any reference to the stock purchase agreement (i.e. Fan's purchase of virtually the entire public float), and misrepresented that "[t]here are no arrangements or understanding between [Fan] and any other person pursuant to which he was selected as a Director." Harrison remained an officer and director of Dinello/AF Ocean until July 2013, and remained involved as legal counsel in, among other things, drafting periodic reports which continued to omit references to the stock purchase agreement or Fan's payment for virtually the entire public float.

### 2.     Daniels Creates Three Companies for Fan

37.     After the Dinello/AF Ocean sale, Daniels agreed to create additional public vehicles from scratch for Fan with money provided by Fan. On October 7, 2011, Daniels

emailed Fan "my business model [including the purchase of a local business 'used to get the public trading symbol'] is the best . . . . It does not carry 'shell' problems and they are always DTC eligible and clean." On December 28, 2011, Daniels emailed Fan "I am considered one of the best at what I do ... so that a person does not get labeled as a 'shell mill.' That is a death knell for that person or his company. Telephones and computers have 'ears' and what we need to say needs to be out of 'earshot.'"

38.     Daniels hired a business broker to locate small businesses to purchase with money already deposited by Fan into Harrison's law firm trust account. On January 5, 2012, Daniels emailed Fan "I have lined up 32 different businesses to begin to perform due diligence on for ones to have you purchase to take public. I expect that we should be able to find 2-3 that will meet our needs to clear the SEC and FINRA as well as DTC eligibility." Daniels provided the business broker with certain criteria, including an entity with 100% of its stock available for sale, annual revenues under $150,000, and owners that would stay on to keep operating the business. For example, on February 29, 2012, Daniels emailed Fan "the owner is going to stay on for about a year while we go through our process."

39.     Daniels purchased three such Florida local businesses with Fan's money: Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex. Daniels named himself the primary officer of each of these companies and, like J.P. with Dinello/AF Ocean, a friend as a second officer to create the façade of independent management.

40.     As with Dinello/AF Ocean, Daniels put shares in the name of his friends and family by sending money (provided upfront by Fan) to obtain cashier's checks for the purported purchase of the common stock of the local business. Daniels determined the

14

number of shareholders (the same as Dinello/AF Ocean) even before acquiring the local business. For example, on January 15, 2012, Daniels emailed Fan: "We are going to begin the process of the shareholder offers. I need you to give permission to [Harrison] to disburse $13,110 from the escrow [provided by Fan] so I can move forward with the shareholder offers. We will ultimately have 29 shareholders [the same number as Dinello/AF Ocean] with me controlling 77.48%. All of the shareholders are friendly and we have used them many times in the past so we will have no problems in the future."

41.    Harrison, who received a copy of this email, wrote a check to Daniels for $13,110 on January 16, 2012, with the notation "paralegal firm [the pre-existing Court/ChinAmerica local business] purchase." Daniels then sent some of that money to a family member: "so you can give [nine other nominee shareholders] cash with which to purchase the cashier's checks. . . . Let everyone know that they will receive $500 when we do a deal so the amount of stock they are purchasing will not affect their return."

42.    By email dated April 28, 2012, Daniels sent Fan a memorandum indicating that Daniels, as the purported majority shareholder of Court/ChinAmerica and Wallbeds/Sichuan, had "conducted a shareholder meeting for each company. The purpose of this meeting was to gain shareholder agreement on the disposition of their shares. This will confirm that the shareholders in each company are in agreement that they will deliver one hundred percent (100%) of the shares should you bring a project to the company after they have obtained their trading symbol."

43.    Daniels and Harrison then prepared a Form S-1 for a secondary fixed-price offering by the friends-and-family shareholders who had purportedly "invested" in

15

Court/ChinAmerica, Wallbeds/Sichuan and TTB/Ibex.  Harrison filed the required Exhibit 5.1 legal opinion letters in support of the Forms S-1 that the shares had been validly issued. Each Form S-1 claimed that the issuer would follow the local business plan, as opposed to its being a public vehicle for Fan (who was nowhere disclosed).  The Form S-1 also failed to disclose the memorandum that Daniels sent Fan on April 28, 2012, or any of its contents. Specifically, the Forms S-1 misrepresented that the friends-and-family shareholders would offer to sell shares to the public through the Form S-1, whereas Daniels had already committed to transfer the shares to Fan (who had already paid for them).

44.     Each Form S-1 also misrepresented the involvement of the second officer. The Court/ChinAmerica officer did not know she even purportedly held that position, and spent no time toward Court/ChinAmerica (despite the Form S-1 stating that she spent 20 hours per week). TTB/Ibex's second officer stated that his purported officer position was "just . . . a title," and that he took no actions with respect to governance or the shareholders of TTB/Ibex.

45.     By the time TTB/Ibex filed its Form S-1 in November 2012, Commission staff detected that Daniels "has a track record with [Court/ChinAmerica] and [Wallbeds/Sichuan]" of filing Forms S-1 and changing the business plans within three months of Form S-1 effectiveness, and pressed TTB/Ibex as to whether it was a "blank check" company under Rule 419 of the Securities Act.  In response to Commission staff, Daniels, in the name of the second officer, made misrepresentations with respect to both Court/ChinAmerica and Wallbeds/Sichuan's history and TTB/Ibex's business purpose. After further inquiry from Commission staff, TTB/Ibex eventually disclosed itself in the Form S-1

16

as a "blank check company" only because it may later seek an acquisition and otherwise intended to pursue and expand the local business operations for at least one year. However, TTB/Ibex was being set up for Fan from the onset, and Fan had already promised to spin off the assets once all TTB/Ibex shares were formally transferred to him.

46.     Daniels retained the same broker-dealer to file a Form 211 for Court/ChinAmerica, Wallbeds/Sichuan and TTB/Ibex shortly after the Form S-1 became effective. By email dated July 30, 2012, Daniels told M.E., who was the broker-dealer's principal: "[D]on't forget that [Fan] has three companies that he is doing registrations on, including the 211 we filed on Court[/ChinAmerica]."

47.     FINRA raised numerous questions during the Form 211 process. For example, on both Court/ChinAmerica and Wallbeds/Sichuan, FINRA noted that numerous shareholders purportedly purchased shares with sequentially numbered cashier's checks. For Wallbeds/Sichuan, on November 6, 2012, Harrison (copying Daniels and Bradaick) sent the broker-dealer the responses to FINRA that one shareholder obtained the checks with cash gathered from the others, when in fact Daniels gave the cash with instructions to obtain all the cashier's checks.

48.     Bradaick primarily corresponded with the broker-dealer in connection with the TTB/Ibex Form 211. Daniels misrepresented in an affidavit dated August 15, 2013, that Bradaick's husband had paid for his shares, the friends-and-family shareholders were not "affiliates" or nominees, Daniels had not worked in concert with anyone to sell TTB/Ibex securities, and there had been no discussions regarding any change in control in the prior year. Daniels also prepared the response to FINRA's comments misrepresenting that for

TTB/Ibex "at the current time there is no intent to either effect a sale of shares or engage in a merger which would result in a change of control of the company." However, Daniels, Fan and Bradaick had already discussed the spin-off of TTB/Ibex's operations and the transfer of all TTB/Ibex shares to Fan.

49.     Daniels and Harrison kept Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex current in their reporting obligations with the Commission. The reports (including Forms 10-Q and 10-K) misrepresented the business purpose and capitalization of the issuers and the involvement of the second officer, and omitted any reference to Fan. The reports also included officer certifications by Daniels which falsely stated that Daniels was unaware of any material misstatements or omissions in the periodic reports and that the financial information in the reports fairly represented the financial condition of the issuer.

50.     Daniels then effectuated the change of control to Fan by means of his promised transfer of the friends-and-family shares. For Court/ChinAmerica, the friends and family signed Acceptance Agreements and Representation Letters similar to Dinello/AF Ocean between October 22 and November 12, 2012, whereas they had already received a check in the amount of $500 as of October 3, 2012. The shareholders received the $500 checks during the pendency of the Form S-1 fixed-price offering by which each shareholder would have sold his or her shares for a fixed price of over $2,500. $500 was the exact amount Daniels originally told his family member the shareholders would receive, regardless of the number of shares in their name, when requesting that she obtain cashier's checks.

51.     For Wallbeds/Sichuan, by letter dated December 13, 2012, Daniels and Bradaick told Wallbeds/Sichuan shareholders "we have an individual who will be purchasing

your shares of [Wallbeds/Sichuan] stock.  Please find $500 as payment. . . . [D]ocumentation will follow to finalize the transfer of stock."  The Wallbeds/Sichuan transfers occurred in two sets in December 2012 and October 2013, with the signatures of many of the shareholders on the Acceptance Agreements and Shareholder Representation Letters appearing to have been electronically superimposed.   The shareholders received the $500 checks during the pendency of the Form S-1 fixed-price offering by which each shareholder would have sold his or her shares for a fixed price of over $12,000.

52.    Daniels and Harrison prepared Forms 8-K misrepresenting both the resignation of the second officer (e.g. for "family obligations") and the nature of Fan's appointment (e.g. failing to disclose his complete capitalization from the onset and takeover of the entire public float).

53.    After the announcement, the local business operations were abandoned or spun off.  For example, with Wallbeds/Sichuan, Daniels directed a business broker to sell the assets and Harrison prepared the draft agreement for the sale of "the assets and liabilities ONLY.  The business entity itself is not for sale."

54.    Daniels and Harrison also assisted Fan in selling a Harrison/Daniels Company as a public vehicle as early as February 2014.  In April 2014, Harrison drafted a stock purchase agreement by which both Fan and his designees would sell their shares of Wallbeds/Sichuan together to one buyer for $250,000.  Fan sent Harrison a markup of the agreement indicating that he had blank stock powers from his designees, and would thus sell all the subject shares in his own name.  Soon thereafter, again with the participation of Daniels and Harrison, Fan instead signed a stock purchase agreement for a change of control

of TTB/Ibex to the same buyer. Upon the change of control, Harrison became an officer of TTB/Ibex along with the buyer.

### 3.    Bradaick's Assistance with the Harrison/Daniels Companies

55.    In or about March 2012, Bradaick was hired by Daniels to assist with taking Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex public for Fan. These going-public efforts were conducted through Dinello/AF Ocean, which Fan then solely owned. Bradaick became an employee and Harrison an officer and legal counsel of Dinello/AF Ocean to support these going-public efforts.

56.    Bradaick knew that Daniels and Fan's goal from the onset was to create "pubcos" masked by local business operations purchased by Fan to be spun off upon the transfer of all shares of the issuer to Fan. Bradaick, at the direction of Daniels or Harrison, took such actions as drafting Commission filings, sending various instructions to the straw shareholders, and preparing Form 211 submissions in order, in her own words, "to sell the pub co part of the company" separate from any assets attributed to it.

57.    Bradaick agreed to be named as the second officer of Wallbeds/Sichuan. Bradaick spent approximately 10-15 hours per week on Wallbeds/Sichuan as part of her full-time Dinello/AF Ocean employment, both to develop Wallbeds/Sichuan as a public vehicle for Fan while barely operating the local business for a later spin-off to her. To the contrary, the Form S-1 misrepresented that Bradaick worked 30 hours per week, failed to disclose her Dinello/AF Ocean employment, and failed to disclose its purpose as a public vehicle for Fan.

58.    Bradaick understood from the onset that the assets of Wallbeds/Sichuan and TTB/Ibex would be given to her and her husband, respectively, upon the sale of the public

entity.  For example, by email dated July 21, 2013 (the date TTB/Ibex's Form S-1 went effective), Bradaick asked Fan: "Do you have something for [TTB/Ibex]?  Will [Bradaick's husband] and I be keeping it per our conversation?"  Harrison then sent Fan a contract for the sale of TTB/Ibex's assets to Bradaick's husband in return for stock (for which Fan had originally paid).  Bradaick's husband in fact received those assets.

### 4.     Daniels and Fan's Manipulation of the Post-Merger Issuers

59.     Rather than a one-time charge (such as $500,000 for Dinello/AF Ocean), Fan paid Daniels and Harrison on an ongoing basis as a "consultant" and legal counsel, respectively, for the Harrison/Daniels Companies (except PurpleReal).  At the time of acquisition of the local business, Daniels used Fan's money to pay himself a "finder's fee" of as much as $31,000 and purchase the control block in Daniels' name.  Harrison handled all of the acquisitions through her trust accounts, and paid herself as much as $3,500 for "escrow services" and charged Dinello/AF Ocean for other closing services.  Daniels and Harrison were then paid monthly up to $12,500 and $7,500, respectively, by Dinello/AF Ocean for creating and maintaining Fan's public companies.

#### a.  Harrison's Opinion Letters

60.     Having created pools of purportedly unrestricted shares in the names of their friends and family, made the shares available for public quotation and transferred those shares to Fan's designees, Daniels and Harrison then assisted Fan with the critical steps of removing restrictive legends and depositing the shares with broker-dealers.  Harrison provided a series of false legal opinion letters to effectuate those steps.

61.     For example, in January 2012, Harrison signed an opinion letter to the transfer

21

agent stating that all Dinello/AF Ocean shares are unrestricted because Fan's designees purchased Form S-1 shares "in a private transaction, without broker or issuer involvement." To the contrary, Harrison and Daniels, who controlled Dinello/AF Ocean, were deeply involved in the bulk purchase of all the purportedly unrestricted shares by Fan via the stock purchase agreement signed by Harrison.  In March 2012, Harrison signed another opinion letter that one of her friends-and-family shareholders was "not controlled by [Dinello/AF Ocean]" and thus "a non-affiliate," despite Daniels and Harrison controlling the shares by, among other things, committing to sell them as early as September 2011 via the stock purchase agreement.  Harrison's opinion letter also falsely stated that the shareholder had paid for the shares.

62.     On November 29, 2012, Harrison signed an opinion letter to the transfer agent that the friends-and-family shareholders of Court/ChinAmerica held unrestricted securities and transferred those shares to 7 Chinese purchasers (including Designee 1) "without issuer or broker involvement," despite (1) Harrison knowing that Fan provided all the capital for the initial purchase of the shares, (2) the use of 26 of the 29 same friends-and-family shareholders as Dinello/AF Ocean (for which Harrison had been the primary officer); (3) Harrison previously knowing Designee 1 as one of Fan's "designees" in the Dinello/AF Ocean stock purchase agreement she had signed; and (4) Harrison having recently received a spreadsheet identifying the purchasers of the Court/ChinAmerica friends-and-family shares as Fan's "people."

63.     On January 11, 2013, November 21, 2013 and November 26, 2013, Harrison signed opinion letters that the friends-and-family shareholders of Wallbeds/Sichuan were

"non-affiliates" who sold their shares to Daniels and the same Fan designees named in the Dinello/AF Ocean stock purchase agreement (who were also "non-affiliates") without broker involvement, despite Harrison knowing that Fan paid for the initial purchase of all Wallbeds/Sichuan shares in the local business acquisition.  In early 2013, Harrison also signed two opinion letters that Wallbeds/Sichuan shares in the name of Bradaick's husband were freely transferable by a "non-affiliate," despite knowing that Bradaick's husband: (1) was the significant other of Bradaick (the President of Wallbeds/Sichuan until at least December 15, 2012); (2) was the named second officer of TTB/Ibex; and (3) was a Dinello/AF Ocean and Court/ChinAmerica shareholder.

64.     On December 5, 2013, Harrison signed an opinion letter to the transfer agent that Bradaick's TTB/Ibex shares were unrestricted because, among other things, she was not an "affiliate" despite her husband being an officer of TTB/Ibex until September 11, 2013 and the Form S-1 disclosing that she beneficially owned his shares.

b.  Open-Market Trading

65.     Daniels and Fan traded in the open market at artificial prices.  Daniels first sold Dinello/AF Ocean shares in the open market in October 2011 to secure DTC eligibility. Daniels had deposited those shares with the broker-dealer misrepresenting, among other things, that he was not an "affiliate" of Dinello/AF Ocean.

66.     Daniels and Fan soon started to increase the share price in open-market trades. By email dated November 28, 2011, Fan wrote to Daniels: "Please sell 500 shares at 65 cents.  I think the 14 cents increase for only 500 shares should not get much scrutiny." Daniels responded: "This is not the type of information we should have in emails. . . .  You

23

will find another 500 at $.65 today." Daniels made that exact trade on November 30, 2011, selling 500 shares at $0.65 (14 cents higher than the previous open-market sale).

67.     In 2012, Daniels sold Dinello/AF Ocean shares up to $1.30, each time setting a new high over the prior market price.

68.     Bradaick joined the manipulative activity, including being on four separate matched trades with Daniels or Fan while working for them at Dinello/AF Ocean. On December 23, 2013, Daniels, Bradaick, and Fan (in two designee accounts) all traded Dinello/AF Ocean stock up to $1.35 per share.

69.     On January 6, 2014, the day after a press release announcing a $1 million consulting agreement, Bradaick made the first open-market sale of Court/ChinAmerica shares at $0.25 per a limit order. On January 8, 2014, Daniels bought and Bradaick sold shares at up to $0.56. On January 9, 2014, Daniels sold those shares at $0.69 and Fan bought shares at $1.

70.     Moreover, Daniels approached Bradaick to sell her TTB/Ibex shares and had told her at which price to sell. In December 2013, Bradaick forwarded an email string (involving Daniels and Harrison) to Fan of her efforts to deposit her TTB/Ibex shares with the message "getting closer." Bradaick also executed multiple sales of Harrison/Daniels Company stock which yielded negative proceeds after commissions, and did not pay Harrison for the legal opinion letters necessary for the deposit of her shares.

71.     By email dated February 13, 2014, Fan wrote to both Daniels and Harrison to focus on "getting [Wallbeds/Sichuan] sold" and "more broker support for all the companies." On April 10, 2014, Fan emailed Harrison (copying Daniels and Bradaick) that he was

agreeing to spin off the TTB/Ibex assets to Bradaick's husband because Daniels "is working hard to help with [Court/ChinAmerica] broker support." On April 22, 2014, Fan made two Court/ChinAmerica matched trades in his designee accounts.

72.    In mid-2014 as relations with Fan cooled, Daniels worked with Bradaick to deflate the Harrison/Daniels Companies' stock prices.  On May 5, 2014, Daniels and Bradaick executed a matched trade in Court/ChinAmerica stock at $0.55 per share – down from Fan's previous trade at $1.50 per share.  On April 29, 2014, Daniels drove the price of Dinello/AF Ocean down from $1.35 to $0.32 per share.

73.    Having proven his point, Daniels then engaged with Fan in manipulative trading to reverse the price decline.  On May 13, 2014, Daniels and Fan (in a designee account) each purchased Dinello/AF Ocean shares – both at the market open at the price of $0.50 per share, and Daniels later in the trading day at $0.77 per share.  The next day, two matched trades between Fan's designee accounts were made at $1 per share.

74.    Public trades (i.e. by those other than Daniels, Brdaick, and Fan) in Dinello/AF Ocean and Court/ ChinAmerica began in December 2013 and January 2014, respectively, shortly after the manipulative trading in each stock.  Ultimately public investors lost money in these stocks.

### 5.    PurpleReal

75.    PurpleReal was Daniels and Harrison's latest vehicle that they developed independent of Fan.  Unlike the other Harrison/Daniels Companies, Daniels and Harrison concocted a purported business plan instead of acquiring an actual local business.  Harrison and Daniels purchased all the issued shares of PurpleReal, put those shares in the names of

friends and family (including Bradaick) through false subscription agreements, and filed a Form S-1 as a purported secondary offering by those nominee shareholders. Bradaick drafted some of the PurpleReal Form S-1 and collected her friends and family as PurpleReal shareholders, after having discussions with Harrison and Daniels in or about January 2014 about "selling the public company part of [PurpleReal]."

76.   The Form S-1 was full of misrepresentations about the purported business plan, shareholders, capitalization, and management of PurpleReal. For example, the Form S-1 stated that the shareholders had "invested" in the issuer (versus Harrison and Daniels fully capitalizing PurpleReal via 5 Dogs).

77.   The Form S-1 also claimed that PurpleReal was not a "blank check company" because it had a specific business plan to develop "an online sales website to import and sell silk products and costume jewelry from Hong Kong and the People's Republic of China." The PurpleReal Form S-1 touts that Harrison and the second officer spent months researching silk and jewelry products in China and are in current talks with Chinese manufacturers to sell quality products at competitive prices. However, Harrison and the second officer did not perform research in China, physically inspect any product, perform any competitive analysis, or communicate with any potential manufacturer or wholesaler. Rather, Harrison and Daniels' intent was to manufacture PurpleReal as a public entity to be sold or acquired.

78.   Harrison and Daniels retained the same broker-dealer which filed the Forms 211 for all other Harrison/Daniels Companies to file a Form 211 for PurpleReal's stock to be publicly quoted. The Form 211 contained similar representations about the business purpose

26

and capitalization of PurpleReal.  By letter dated August 28, 2014, Harrison responded to FINRA's request for a "detailed explanation regarding the purchase of stock by the individual shareholders [of] PurpleReal." Harrison stated that 5 Dogs had "contributed $300 for each shareholder to subscribe for shares" because Daniels "wished to thank these individuals for their support in past endeavors."  However, Daniels and Harrison had no prior relation with some of the straw shareholders, and Harrison failed to disclose the role of the straw shareholders in their plan to sell PurpleReal.

**B.      Harrison's Role in the Mirman and Rose Shell Factory**

79.     Mirman and Rose, alone or together, created and developed the Mirman/Rose Companies:

| Mirman/Rose Company | Effective Date of Form S-1 | Date of Change of Control |
|---|---|---|
| Rainbow Coral Corp. | 1/10/2011 | 10/14/2011 |
| Neutra Corp. | 4/20/2011 | 11/2/2011 |
| Aristocrat Group Corp. | 11/10/2011 | 7/9/2012 |
| First Social Networx Corp. | 3/6/2012 | 2/27/2013 |
| Global Group Enterprises Corp. | 3/26/2012 | 4/26/2013 |
| E-Waste Corp. | 6/14/2012 | 4/26/2013 |
| First Independence Corp. | 8/7/2012 | 5/3/2013 |
| Universal Technology Systems Corp. | 6/12/2013 | 9/24/2013 |
| Envoy Group Corp. | 9/27/2013 | 4/14/2014 |
| First Xeris Corp. | 1/8/2014 | N/A |
| Orion Global Corp. | 5/27/14 (filed) | N/A |

80. Mirman and Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act in name only and fabricated a business plan around that person's background. Mirman and Rose had each sole officer sign a Board resolution for the issuance of shares that were then the subject of false and misleading Forms S-1 supported by legal opinion letters. Once the Forms S-1 went effective, Mirman and Rose solicited approximately 24 friends and family as shareholders while maintaining complete control over the shares through blank stock powers. Mirman and Rose consummated reverse mergers after making the securities DTC eligible based on false legal opinion letters.

81. From September 2010 until June 2014, Mirman and Rose retained Harrison to provide, among other things, 9 Form S-1 opinion letters and 12 opinion letters as to the purportedly unrestricted nature of the Mirman/Rose Companies' securities.

### 1. Harrison Dealt Almost Exclusively with Mirman and Rose

82. Mirman first retained Harrison in September 2010 to provide legal services in connection with Rainbow Coral Corp. ("Rainbow Coral"). Harrison sent Mirman a retainer agreement which identified the scope of services as not only a Form S-1 opinion letter, but also "attorney services as requested in the event of an acquisition, merger, or stock purchase transaction." Harrison utilized this same retainer agreement for subsequent Mirman/Rose Companies "based upon the final terms reached for Rainbow Coral." Harrison's standard retainer agreement for Form S-1 opinion letters makes no mention of an "acquisition, merger, or stock purchase transaction."

83. Harrison communicated almost exclusively with Mirman and Rose with respect to the Mirman/Rose Companies. In October 2011, Mirman and Rose questioned

Harrison about two pending Forms S-1 and told her to transfer monies between the two Mirman/Rose Companies (which were purportedly unrelated with different sole officers) in her trust account. Shortly thereafter, in December 2011, Mirman told Harrison that "[w]e are eliminating the $500 increment [for selling shares] in all our deals [and] future S-1s." Harrison received at least one other email where Mirman referred to a Mirman/Rose Company as their "deal" even at the early Form S-1 stage.

84.     By December 2012, Harrison was aware that Mirman and Rose had sold at least three Mirman/Rose Companies to the same lawyer. In September 2012, Harrison drafted a Form 8-K for that lawyer with respect to the purported new line of business for one of the issuers (from prenatal care centers to a vodka promoter). By email dated January 10, 2013, the lawyer asked Harrison for a quote to prepare the periodic reports for the acquired Mirman/Rose Companies, which the lawyer referred to as the "companies [Harrison] built."

85.     In August 2013, Mirman told Harrison (copying only Rose) "we are in the process of selling Universal Technology and need an opinion letter similar to the attached that you provided for [another Mirman/Rose Company]." Harrison provided the Form S-1 opinion letter for Universal Technology in March 2013. Harrison knew Universal Technology was being sold within a few months after its Form S-1 approval.

### 2. Harrison Submitted 9 Form S-1 Opinion Letters

86.     From September 2010 to May 2014, Harrison submitted 9 opinion letters in support of Forms S-1 of Mirman/Rose Companies that the shares in the registered offering "will be validly issued, fully paid and non-assessable." To be validly issued, the Board of

Directors must have determined the adequacy of the price at which the securities would be offered:

### CHART A – HARRISON'S FORM S-1 OPINION LETTERS

| Blank Check Company | Effective (or Filing) Date of Form S-1 | Date of Harrison Legal Opinion Letter |
|---|---|---|
| Rainbow Coral | 1/10/2011 | 9/24/2010 |
| Neutra | 4/20/2011 | 2/24/2011 |
| Aristocrat Group | 11/10/2011 | 8/24/2011 |
| First Social Networx | 3/6/2012 | 11/7/2011 |
| Global Group Enterprises | 3/26/2012 | 2/2/2012 |
| E-Waste | 6/14/2012 | 3/19/2012 |
| First Independence | 8/7/2012 | 4/10/2012 |
| Universal Technology | 6/12/2013 | 3/15/2013 |
| Orion Global | 5/27/2014 | 5/27/2014 |

87.     Harrison ignored a number of red flags with respect to the Form S-1 opinion letters.  In December 2011, Mirman told Harrison that "[w]e are eliminating the $500 increment [for selling shares] in all our deals [and] future S-1s" – i.e. Mirman and Rose, not the Board, were setting the offer prices.  Harrison also ignored that the offerings were the same small size ($30,000) for companies with far larger operating budgets and different sole officers purportedly in different lines of business.

88.     Harrison also submitted 9 responses to Form S-1 comments by the Commission staff on behalf of Mirman/Rose Companies.  For example, Harrison's responses misrepresented the non-"blank check" or "shell" company status of some of the Mirman/Rose Companies.  Commission staff even questioned that Rose was the father of the sole officer of a Mirman/Rose Company whose business plan mirrored an issuer Rose had

previously sold by reverse merger.  Harrison's response again misrepresented the business

purpose of that Mirman/Rose Company.

### 3. Harrison Submitted 11 Opinion Letters Regarding the Unrestricted Nature of Control Securities

89.     From September 2012 to March 2014, Harrison submitted 12 opinion letters

to DTC, transfer agents, and buyers as to the unrestricted nature of the securities of the

Mirman/Rose Companies.

## CHART B – HARRISON'S FALSE UNRESTRICTED OPINION LETTERS

| Mirman/Rose Company | Date | Addressee | False Statements |
|---|---|---|---|
| Global Group | 9/18/2012 | DTC | Shares in name of shareholder (hereinafter referred to by her first and last initials, "K.M.") are unrestricted.  The Company informed Harrison that K.M. was not an "affiliate" |
| E-Waste | 1/2/2013 | Buyers | Shares in name of straw shareholders are unrestricted.  E-Waste is not a "shell company." |
| First Social Networx | 2/19/2013 | DTC | Shares in name of shareholder (hereinafter referred to by his first and last initials, "A.C.") are unrestricted.  The Company informed Harrison that A.C. was not an "affiliate" |
| Global Group | 2/21/2013 | Buyers | Shares in name of straw shareholders and the nominee sole officer are unrestricted.  Global Group is not a "shell company." |
| First Independence | 3/26/2013 | DTC | Shares in name of K.M. are unrestricted.  The Company informed Harrison that K.M. was not an "affiliate" |
| First Independence | 5/21/2013 | Transfer Agent | Shares in name of straw shareholders (including K.M. and A.C.) are unrestricted.  Shareholders are not "affiliates." |
| First Social Networx | 5/21/2013 | Transfer Agent | Shares in name of straw shareholders (including A.C. and husband of First Social Networx's sole officer) are unrestricted.  Shareholders are not "affiliates."  First |

| Mirman/Rose Company | Date | Addressee | False Statements |
|---|---|---|---|
| | | | Social Networx is not a "shell company." |
| Universal Technology | 8/27/2013 | DTC | Shares in name of A.C. are unrestricted.  The Company informed Harrison that A.C. was not an "affiliate" |
| Universal Technology | 9/16/2013 | Transfer Agent | Shares in name of straw shareholders (including A.C.) are unrestricted. Shareholders are not "affiliates." |
| Envoy Group | 10/24/2013 | Transfer Agent | Shares in name of straw shareholders (including A.C.) are unrestricted. Shareholders are not "affiliates." |
| Envoy Group | 1/2/2014 | DTC | Shares in name of A.C. are unrestricted.  The Company informed Harrison that A.C. was not an "affiliate" |
| First Xeris | 3/21/2014 | DTC | Shares in name of straw shareholder are unrestricted |

90.    Harrison was aware that Mirman and Rose requested these opinion letters in the course of bulk sales of both the control block and entire public float of the Mirman/Rose Companies.  For example, Harrison signed the E-Waste opinion letter shortly after signing an escrow agreement in connection with the sale of "100% of the free trading shares of common stock to one or more prospective purchasers thereof," with Rose as "Sellers' Representative" for all of the purported shareholders.  For the opinions to transfer agents and buyers, Harrison provided "blanket" opinions covering all the Form S-1 shares.

91.    Harrison addressed six of these opinion letters to DTC for purposes of making the securities of the Mirman/Rose Companies eligible for electronic clearance based on the deposit of one shareholder.   In each of these opinion letters, Harrison stated that "the Company has informed us that the Holder is not ... an 'affiliate' of the Company as defined in Rule 144(a)(1)," when her only source of information was Mirman or Rose.   Of the six opinion letters to DTC, three named the same shareholder (who also appeared on all six of

32

Harrison's opinion letters to buyers and transfer agents) and two were in the name of another shareholder.

92.     Harrison also prepared six "blanket" opinion letters to transfer agents and/or buyers that the shares of the Mirman/Rose Companies in the names of approximately 25 shareholders (identified on an attached schedule) were unrestricted because they were not "affiliates." These opinion letters stated "we are familiar with the sellers and/or with the principals of the company who are familiar with the sellers. We and such principals have knowledge of the sellers' desire to sell the shares." However, Harrison's only source of information with respect to these opinion letters was Mirman or Rose (who was neither a named principal or seller).

93.     In three of these opinion letters, Harrison specifically opined that the Mirman/Rose Company was not a "shell company" based on her review of the issuer's periodic reports, despite these reports containing a "shell company" designation on the cover page (and otherwise disclosing nominal assets and no revenues). Three of these opinion letters included the sole officer or his/her spouse as being a "non-affiliate," despite the Form S-1 stating that the sole officer was the only "parent" and owned 75% of the shares.

94.     In May 2013, Rose retained Harrison to submit two opinion letters for two separate Mirman/Rose Companies on the same date to the same buyer's counsel because "we would like to satisfy these buyers as soon as possible." Rose specifically told Harrison that "both [Mirman/Rose Companies'] free trading and restricted stock have been purchased by two separate buyers." The selling shareholders on these opinion letters included the sole officers of three other Mirman/Rose Companies and the two shareholders who were the

33

subject of Harrison's opinion letters to DTC. One of these opinion letters was for First Independence Corp., a Mirman/Rose Company which became the subject of a fraudulent pump-and-dump in public trading within a few days of Harrison's opinion letter.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act

### (Against Harrison and Daniels)

95. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

96. From no later than July 2010 through August 2014, Harrison and Daniels, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud.

97. By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### Violations of Section 17(a)(2) of the Securities Act

### (Against Harrison and Daniels)

98. The Commission repeats and realleges Paragraphs 1 through 93 of its Complaint.

99. From no later than July 2010 through May 2014, Harrison and Daniels, in the offer or sale of any securities by the use of any means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

100. By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT III

## Violations of Section 17(a)(3) of the Securities Act

### (Against Harrison and Daniels)

101. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

102. From no later than July 2010 through August 2014, Harrison and Daniels, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

103. By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT IV

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against Harrison and Daniels)

104.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

105.   From no later than July 2010 through May 2014, Harrison and Daniels directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security.

106.   By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

## COUNT V

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against Harrison and Daniels)

107.   The Commission repeats and realleges Paragraphs 1 through 94  of its Complaint.

108.   From no later than July 2010 through May 2014, Harrison and Daniels, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the

36

circumstances under which they were made, not misleading in connection with the purchase or sale of any security.

109.   By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### (Against Harrison and Daniels)

110.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

111.   From no later than July 2010 through May 2014, Harrison and Daniels directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security.

112.   By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

## COUNT VII

### Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act

#### (Against Harrison and Bradaick)

113.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

114.   From no later than September 2011 through June 2014, Daniels and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

115.   From at least as early as September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and is deemed to be in violation of this provision to the same extent as Daniels and Fan.

116.   From no later than September 2011 through August 2014, Daniels, Harrison and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

117.   From at least as early as March 2012 through August 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's

violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and is deemed to be in violation of this provision to the same extent as Daniels, Harrison and Fan.

118.   From no later than August 2010 through August 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

119.   From at least as early as September 2010 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and is deemed to be in violation of this provision to the same extent as Mirman and Rose.

120.   By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT VIII

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

### (Against Harrison and Bradaick)

121.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

122.   From no later than September 2011 through May 2014, Daniels and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

123. From at least as early as September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and is deemed to be in violation of this provision to the same extent as Daniels and Fan.

124. From no later than September 2011 through May 2014, Daniels, Harrison and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

125. From at least as early as March 2012 through May 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and is deemed to be in violation of this provision to the same extent as Daniels, Harrison and Fan.

126. From no later than August 2010 through January 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

127.    From at least as early as September 2010 through January 2014, Harrison knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and is deemed to be in violation of this provision to the same extent as Mirman and Rose.

128.    By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IX

### Aiding and Abetting Violations of Section 17(a)(3) of the Securities Act

### (Against Harrison and Bradaick)

129.    The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

130.    From no later than September 2011 through June 2014, Daniels and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of

such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

131.   From at least as early as September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and is deemed to be in violation of this provision to the same extent as Daniels and Fan.

132.   From no later than September 2011 through August 2014, Daniels, Harrison and Fan, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

133.   From at least as early as March 2012 through August 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and is deemed to be in violation of this provision to the same extent as Daniels, Harrison and Fan.

134.   From no later than August 2010 through August 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of

such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

135.   From at least as early as September 2010 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Martin and Rose's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and is deemed to be in violation of this provision to the same extent as Mirman and Rose.

136.   By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT X

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(a) of the Exchange Act

#### (Against Harrison and Bradaick)

137.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

138.   From no later than September 2011 through June 2014, Daniels and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

139.   From no later than September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 10(b)

43

and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a), and is deemed to be in violation of these provisions to the same extent as Daniels and Fan.

140.   From no later than September 2011 through June 2014, Daniels, Harrison and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

141.   From no later than March 2012 through June 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a), and is deemed to be in violation of these provisions to the same extent as Daniels, Harrison and Fan.

142.   From no later than August 2010 through January 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed any device, scheme or artifice to defraud in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

143.   From no later than September 2010 through January 2014, Harrison knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. §

44

240.10b-5(a), and is deemed to be in violation of these provisions to the same extent as Mirman and Rose.

144.   By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a).

## COUNT XI

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(b) of the Exchange Act

### (Against Harrison and Bradaick)

145.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

146.   From no later than September 2011 through May 2014, Daniels and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

147.   From no later than September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b), and is deemed to be in violation of these provisions to the same extent as Daniels and Fan.

148.   From no later than September 2011 through May 2014, Daniels, Harrison and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

149.   From no later than September 2011 through May 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b), and is deemed to be in violation of these provisions to the same extent as Daniels, Harrison and Fan.

150.   From no later than August 2010 through January 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

151.   From no later than September 2010 through January 2014, Harrison knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. §

240.10b-5(b), and is deemed to be in violation of these provisions to the same extent as Mirman and Rose.

152.   By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b).

## COUNT XII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(c) of the Exchange Act

**(Against Harrison and Bradaick)**

153.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

154.   From no later than September 2011 through June 2014, Daniels and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

155.   From no later than September 2011 through May 2014, Harrison knowingly or recklessly provided substantial assistance to Daniels and Fan's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c), and is deemed to be in violation of these provisions to the same extent as Daniels and Fan.

156.   From no later than September 2011 through June 2014, Daniels, Harrison and Fan directly and indirectly, by use of any means or instrumentality of interstate commerce, or

47

of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

157.   From no later than March 2012 through June 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels, Harrison and Fan's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c), and is deemed to be in violation of these provisions to the same extent as Daniels, Harrison and Fan.

158.   From no later than August 2010 through January 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of any security, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

159.   From no later than September 2010 through January 2014, Harrison knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c), and is deemed to be in violation of these provisions to the same extent as Mirman and Rose.

160.   By reason of the foregoing, Harrison and Bradaick aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(c).

## COUNT XIII

### Violations of Section 9(a)(1) of the Exchange Act
### (Against Daniels)

161.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

162.   From no later than December 2013 through May 2014, Daniels, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, entered an order or orders for the sale of a security registered on a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in a security other than a government security, with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

163.   By reason of the foregoing, Daniels violated, and, unless enjoined, is reasonably likely to violate, Section 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1).

## COUNT XIV

### Aiding and Abetting Violations of Section 9(a)(1) of the Exchange Act

### (Against Bradaick)

164. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

165. **From no later than December 2013_to at least May 2014,** Daniels, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange, entered an order or orders for the sale of a security registered on a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in a security other than a government security, with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties, and by reason of the foregoing, violated Section 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1).

166. From no later than December 2013 through May 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels' violations of Section 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1), and is deemed to be in violation of this provision to the same extent as Daniels.

167. By reason of the foregoing, Bradaick aided and abetted and, unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 9(a)(1) of the Exchange Act, 15 U.S.C. § 78i(a)(1).

**COUNT XV**

**Violations of Section 9(a)(2) of the Exchange Act**

**(Against Daniels)**

168. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

169. From no later than November 2011 through May 2014, Daniels, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

170. Daniels acted with the intent to induce trading by others.

171. By reason of the foregoing, Daniels violated and, unless enjoined, is reasonably likely to continue to violate Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

**COUNT XVI**

**Aiding and Abetting Violations of Section 9(a)(2) of the Exchange Act**

**(Against Bradaick)**

172. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

173. From no later than November 2011 through May 2014, Daniels, directly or indirectly, by the use of the mails or means or instrumentalities of interstate commerce, or of

a facility of a national securities exchange, effected, alone or with one or more other persons, a series of transactions in securities creating actual or apparent active trading in such securities, or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others, and by reason of the foregoing, violated Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

174.    From no later than December 2013 through January 2014, Bradaick knowingly or recklessly provided substantial assistance to Daniels' violations of Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2), and is deemed to be in violation of this provision to the same extent as Daniels.

175.    By reason of the foregoing, Bradaick aided and abetted and, unless enjoined, is reasonably likely to continue to aid and abet, violations of Section 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i(a)(2).

## COUNT XVII

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Harrison)

176.    The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

177.    From no later than September 2010 until at least January 2014, Harrison, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and has made use of the means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

178. There were no applicable exemptions from registration.

179. By reason of the foregoing, Harrison violated, and unless enjoined, is reasonably likely to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

## COUNT XVIII

### Violations of Rule 13a-14 of the Exchange Act

### (Against Harrison and Daniels)

180. The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

181. From no later than May 2011 through November 2014, Harrison served as the principal executive officer and principal financial officer of Dinello/AF Ocean and PurpleReal that filed reports under Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a).

182. From no later than May 2011 through November 2014, Harrison signed the certifications in the forms specified in the applicable exhibit filing requirements of the required reports Dinello/AF Ocean and PurpleReal filed with the Commission. Harrison knew or should have known the certifications were false.

183. From no later than July 2012 through November 2013, Daniels served as the principal executive officer and principal financial officer of Court/ChinAmerica,

Wallbeds/Sichuan and TTB/Ibex that filed reports under Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a).

184.   From no later than July 2012 through November 2013, Daniels signed the certifications in the forms specified in the applicable exhibit filing requirements of the required reports Court/ChinAmerica, Wallbeds/Sichuan and TTB/Ibex filed with the Commission. Daniels knew or should have known the certifications were false.

185.   By reason of the foregoing, Harrison and Daniels violated, and, unless enjoined, are reasonably likely to continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

<div align="center">

**COUNT XIX**

**Aiding and Abetting Violations of Section 13(a) and
Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act**

**(Against Harrison and Daniels)**

</div>

186.   The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

187.   Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires issuers of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, to file reports in conformity with the Commission's rules and regulations. Rule 13a-1 of the Exchange Act, 17 C.F.R. § 240.13a-1, requires the filing of accurate annual reports, Rule 13a-11 of the Exchange Act, 17 C.F.R. § 240.13a-1, requires the filing of accurate current reports, and Rule 13a-13 of the Exchange Act, 17 C.F.R. § 240.13a-13, requires the filing of accurate quarterly reports. Rule 12b-20 of the Exchange Act, 17 C.F.R. § 240.12b-20, requires an

<div align="center">54</div>

issuer to include in its annual and quarterly reports material information as may be necessary to make the required statements, in light of the circumstances in which they are made, not misleading.

188.    From no later than April 2011 through the present, the Harrison/Daniels Companies had a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, and were required to file annual, current, and quarterly reports with the Commission. The Harrison/Daniels Companies failed to comply with the required reporting provisions of the federal securities laws, and by reason of the foregoing, violated Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

189.    From no later than May 2011 through November 2014, Harrison and Daniels knowingly or recklessly provided substantial assistance to the Harrison/Daniels Companies' violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13, and are deemed to be in violation of these provisions to the same extent as the Harrison/Daniels Companies.

190.    By reason of the foregoing, Harrison and Daniels aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 of the Exchange Act, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

## COUNT XX

### Aiding and Abetting Violations of Rule 13a-14 of the Exchange Act
### (Against Harrison and Daniels)

191.    The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

192.    Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14, requires the annual and quarterly reports filed pursuant to Section 13(a) of the Exchange Act to be accompanied by certifications signed personally by the principal executive officer and principal financial officer of the issuer.

193.    From no later than May 2011 through August 2011, Dinello/AF Ocean violated Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

194.    From no later than May 2011 through August 2011, Harrison and Daniels knowingly or recklessly provided substantial assistance to Dinello/AF Ocean's violations of Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14, and are deemed to be in violation of this provision to the same extent as Dinello/AF Ocean.

195.    By reason of the foregoing, Harrison and Daniels aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

56

## COUNT XXI

## Unjust Enrichment

### (Against 5 Dogs)

196.    The Commission repeats and realleges Paragraphs 1 through 94 of its Complaint.

197.    Relief Defendant 5 Dogs obtained funds as part, and in furtherance of the securities violations alleged above without a legitimate claim to those funds, and under those circumstances it is not just, equitable or conscionable for 5 Dogs to retain the funds. Relief Defendant 5 Dogs was unjustly enriched.

198.    Relief Defendant 5 Dogs should be ordered to disgorge the funds it received as a result of Defendants Harrison and Daniels' violations of the federal securities laws.

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### I.

## Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### Conduct-Based Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Harrison from directly or indirectly providing, or receiving compensation from the provision of, professional legal services to any person or entity in connection with the offer or sale of securities pursuant to, or claiming, an exemption under Section 4(a)(1) predicated on Securities Act Rule 144, or any other exemption from the registration provisions of the Securities Act, including, without limitation, participating in the preparation or issuance of any opinion letter relating to such offering or sale.

## III.

### Disgorgement

Issue an Order directing Defendants and Relief Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## IV.

### Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## V.

### **Penny Stock Bar**

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Defendants from participating in any future offering of a penny stock.

## VI.

### **Officer and Director Bar**

Issue an Order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), barring Defendants from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## VII.

### **Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VIII.

### **Retention of Jurisdiction**

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants and Relief Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable

application or motion by the Commission for additional relief within the jurisdiction of this

Court.

Dated: April 24, 2018

Respectfully submitted,

By:

Amie Riggle Berlin
Senior Trial Counsel
Florida Bar No. 630020_____
Direct Dial:  (305) 982-6322
E-mail: berlina@sec.gov
*Lead Attorney*
*Attorney To Be Noticed*

Jeffrey Cook
Senior Counsel
Florida Bar No.647578
Direct Dial: (305) 982-6344
Email: cookj@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile: (305) 536-4154