**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CASE NO. 8:18-cv-1003-T-23GW**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DIANE J. HARRISON, MICHAEL J. DANIELS,** | ) |
| **and CATHERINE A. BRADAICK-ZOLLA,** | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **5 DOGS, INC.,** | ) |
| | ) |
| **Relief Defendant.** | ) |
| _____ | ) |

**PLAINTIFF'S MOTION FOR ENTRY OF FINAL JUDGMENTS AGAINST**
**DEFENDANTS MICHAEL DANIELS AND DIANE HARRISON**

Plaintiff Securities and Exchange Commission moves the Court to enter Final

Judgments against Defendants Michael Daniels and Diane Harrison that order: (1) Daniels

to pay disgorgement of $153,471, prejudgment interest on disgorgement of $20,754, and a

civil penalty of $200,000; and (2) Harrison to pay disgorgement of $88,500, prejudgment

interest on disgorgement of $11,968, and a civil penalty of $200,000.  In support of this

motion, the Commission is including: the supporting declaration of Stuart Soffian and its

accompanying exhibits (Exhibit A); prejudgment interest calculations (Exhibits B and C);

the Expert Report of Robert B. Robbins (Exhibit D); the information and docket report

from *USA v. Daniels,* Criminal Case No. CR-S-99-0408 (D. Nev. 1999) (Exhibit E); and pleadings from a subpoena enforcement action against Daniels (Composite Exhibit F).

## I.  Relevant Procedural History

On November 8, 2018, the Commission filed an Amended Complaint against Daniels and Harrison (along with Catherine Bradaick-Zolla, against whom the Court has already entered a final judgment) for violations of the anti-fraud and other provisions of the federal securities laws, and named 5 Dogs Inc. as a Relief Defendant [DE 68].  On September 18, 2019, as a result of Court-ordered mediation, the Commission staff reached partial settlements with both Daniels and Harrison under which, among other things, both agreed to entry of judgments containing all the non-monetary relief the Commission sought against them [DE 136 and 139].  The Commission filed an unopposed motion attaching the consents of Harrison and Daniels and the proposed judgments on November 21, 2019 [DE 139 and Exs. A-D].  The Court has not yet ruled on the motion or entered the judgments.

## II.  Facts Alleged In The Complaint And Accepted As True For This Motion

At the mediation, Daniels and Harrison both consented to the proposed judgments [DE 139 at Exhibits A and C].  Under both consents, Daniels and Harrison are precluded from arguing that they did not violate the federal securities laws as alleged in the Amended Complaint, and the allegations of the Amended Complaint are deemed admitted for purposes of this Motion. [DE 139, Ex. A, ¶3; DE 139, Ex. C, ¶3; DE 139, Ex. B, §VIII; DE 139, Ex. D, §IX].  Thus, for purposes of deciding this motion, the following allegations of the Amended Complaint are deemed admitted and the Court may take them as true.

### A.  Summary Of The Relevant Fraudulent Scheme

From no later than July 2010 through August 2014, Daniels and Harrison manufactured five public companies: Dinello Restaurant Ventures, Inc. n/k/a/ AF Ocean Investment Management Company ("Dinello/AF Ocean"); Court Document Services, Inc. n/k/a ChinAmerica Andy Movie Entertainment Media Company ("Court/ChinAmerica"); Quality Wallbeds, Inc. n/k/a Sichuan Leaders Petrochemical Company ("Wallbeds/Sichuan"); Top to Bottom Pressure Washing, Inc. n/k/a Ibex Advanced Mortgage Technology, Inc. ("TTB/Ibex"); and PurpleReal.com Corp. ("PurpleReal") (collectively, the "Harrison/Daniels Companies").  [DE 1, ¶3].

Harrison and Daniels created the Harrison/Daniels Companies with the undisclosed intent to sell them primarily for their status as public companies with a pool of securities purportedly available for public trading.  [*Id.*, ¶4].  Harrison and Daniels' scheme followed a consistent pattern.  Daniels and Harrison acquired a small local business and provided approximately 30 friends and relatives with money to buy shares in the business, to give the false appearance that these were independent shareholders who had decided on their own to invest in the company.  Daniels and Harrison prepared, and Harrison then filed, a registration statement on Form S-1 with the Commission to register a sham secondary public offering of the shares (when they had already planned to arrange the bulk sale of the shares to a third party).  Daniels and Harrison used the identities of friends, sometimes without their knowledge, to be fellow officers to create a mirage of not just independent investors, but also independent management.  Each registration statement made false and misleading statements concerning the officers, the company's business purpose, and the

selling shareholders.  [*Id.,* ¶5].

Daniels and Harrison then orchestrated filings with FINRA and DTC for the shares in the registered offerings to be eligible for open-market trading and electronic clearing. Daniels and Harrison failed to disclose in any filings with the Commission, FINRA or DTC their intent at all material times to manufacture the Harrison/Daniels Companies as public vehicles and their control over all of their issued securities. [*Id.,* ¶6].  Daniels and Harrison sold four of the Harrison/Daniels Companies to Andy Z. Fan for up to $500,000 each by transferring all or nearly all of the shares of the companies to Fan or his designees pursuant to false shareholder representation letters, agreements and legal opinion letters. [*Id.,* ¶7].  Daniels and Harrison continued to support Fan after the sales by preparing false Commission filings, drafting false legal opinion letters claiming the company shares were unrestricted and could be sold again, and engaging in manipulative trades to artificially raise the price of the stocks.  [*Id.,* ¶8].  In Daniels' own words, he and Harrison carefully orchestrated the scheme to avoid the companies being labeled as a "shell mill."  [*Id.*, ¶24].

### B.  Dinello/AF Ocean – The Scheme Starts

In 2010, Daniels and Harrison acquired a local pizzeria through the purchase of the company stock in the names of 29 friends and family.  Daniels sent the friends and family all the money for them to obtain cashier's checks as the purported payment for the stock. The two then installed Harrison and a long-time friend who knew nothing about the business as officers.  [*Id.,* ¶25].   In February 2011, Daniels and Harrison filed a Form S-1 registration statement for a purported secondary offering of the friends-and-family shares. Dinello/AF Ocean's Form S-1 misrepresented that the friends and family had invested in

the company (whereas they had been gifted the shares), its business purpose was the operation of a pizza business with no anticipated change in the next year (whereas Daniels and Harrison always planned to sell the entity as a public vehicle), and the friend who was an officer was spending 40 hours per week on the business (whereas he spent no time on Dinello/AF Ocean). [*Id.,* ¶27].   In addition, the Form S-1 as well as subsequent periodic Commission filings for Dinello/AF Ocean, all of which Daniels or Harrison drafted, contained the forged electronic signature and certifications by the friend/officer.  [*Id.*, ¶28].

In May 2011, Harrison retained a broker-dealer to file a Form 211 application with FINRA for Dinello/AF Ocean shares to obtain a ticker symbol and be quoted for public trading.  The Form 211 and responses to FINRA's deficiency letters, which Daniels and Harrison helped prepare, contained misrepresentations with respect to the management, business purpose, and shareholders of Dinello/AF Ocean to give the false appearance of an operating company with a specific business plan (i.e. no plans to seek a merger or acquisition), independent management, and independent shareholders.  [*Id.,* ¶30].

Daniels and Harrison were then introduced to Fan as a prospective buyer of public companies and arranged a sale of shares to him.  [*Id.,* ¶32].  Throughout the sales process, Daniels and Harrison made numerous misrepresentations and omissions in Commission and Form 211 filings designed to mask their complete control over the company as well as the fact that it was a shell operation.  [*Id.,* ¶33].  During the same time the two were creating the public appearance of an independent, operating company, Harrison was directing the friends and family shareholders on how to transfer their stock to Fan and his designees, including telling them to sign documents that contained false representations

that the family and friends were not selling their shares in conjunction with any other person or as part of any organized distribution, and that no one had exerted any influence over them to sell.  [*Id.,* ¶¶34 and 35].

In September and October 2011, Daniels and Harrison arranged the filing of false Forms 8-K for Dinello/AF Ocean that, among other things, announced the appointment of Fan as an officer and director of the company, but did not disclose that Fan had bought virtually all the shares of the company.  [*Id.*, ¶36].

### C.  Daniels Creates Three Companies For Fan

After the Dinello/AF Ocean sale, Daniels, with Harrison's assistance, agreed to create additional public vehicles for Fan.  [*Id.,* ¶37].  Daniels purchased three Florida local businesses with Fan's money: Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex. Daniels named himself the primary officer of each company and, as with Dinello/AF Ocean, a friend as a second officer to create the façade of independent management.  [*Id.,* ¶39].  Also as with Dinello/AF Ocean, Daniels, with Harrison's assistance, determined the number of "friendly" shareholders and put shares in the names of those friends and relatives by sending them money Fan had provided to obtain cashier's checks to buy the stock, while retaining control over the majority of the shares.  [*Id.,* ¶¶40, 41, and 42].

Daniels and Harrison later prepared Forms S-1 for a secondary fixed-price offering by the friends and family shareholders who had purportedly independently invested in Court/ChinAmerica, Wallbeds/Sichuan and TTB/Ibex.  In support of the Forms S-1, Harrison filed the required legal opinion letters stating the shares had been validly issued. Each Form S-1 claimed that the issuer would follow the business plan, as opposed to the

reality of its being a public vehicle for Fan, who was nowhere disclosed.  The Forms S-1 misrepresented that the friends and family shareholders would offer to sell shares to the public through the Form S-1, whereas Daniels had already committed to transfer the shares to Fan, who had already paid for them.  [*Id.,* ¶43].  Each Form S-1 also misrepresented the involvement of the second officer.  The Court/ChinAmerica officer did not know she even purportedly held that position, and spent no time on Court/ChinAmerica, despite the Form S-1 stating that she spent 20 hours per week.  TTB/Ibex's second officer stated that his purported officer position was "just . . . a title," and that he took no actions with respect to governance or the shareholders of TTB/Ibex.  [*Id.,* ¶44].

Daniels retained the same broker-dealer as with Dinello/AF Ocean to file a Form 211 for Court/ChinAmerica, Wallbeds/Sichuan and TTB/Ibex shortly after each company's registration became effective.  [*Id.,* ¶46].  FINRA raised numerous questions during the Form 211 processes, noting for example that numerous shareholders had purchased shares with sequentially numbered cashier's checks.  On November 6, 2012, Harrison, copying Daniels, sent the broker-dealer a response to FINRA that one shareholder obtained the checks with cash from the others, when in fact Daniels gave the cash to the shareholder with instructions to obtain all the cashier's checks.  [*Id.,* ¶47].

Daniels was in charge of gathering all information for the Forms 211 filed by the broker-dealer on behalf of Dinello/AF Ocean, Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan, drafting or editing the Forms, and either corresponding directly with the broker-dealer or directing Bradaick and others what to say in correspondence with the broker-dealer.  When the broker-dealer sent requests for comments from FINRA on the

Forms 211, Daniels supervised the process of providing responsive information and frequently provided it himself.  [*Id.*, ¶49].  This included a fraudulent affidavit in August 2013 in support of the Form 211 for TTB/Ibex misrepresenting the status of the friends and family shareholders and the intent of the companies to continue operating, as well as several other pieces of fraudulent information in support of that application regarding the officers, directors, and shareholders.  [*Id.*, ¶¶48, 50, and 51].

After the three companies became public, Daniels and Harrison kept them current in their reporting obligations with the Commission.  Daniels had a role in drafting or editing every one of the periodic reports of the three companies.  The reports (including Forms 10-Q and 10-K) misrepresented the business purpose and capitalization of the issuers and the involvement of the second officer, and omitted any reference to Fan.  The reports also included officer certifications by Daniels which falsely stated that Daniels was unaware of any material misstatements or omissions in the periodic reports and that the financial information in the reports fairly represented the financial condition of the issuer.  This included numerous reports in 2013 and 2014.  [*Id.*, ¶¶53, 54].

Daniels and Harrison then effectuated a change of control in the three companies to Fan by means of Daniels' promised transfer of the friends and family shares.  [*Id.*, ¶¶55, 56].  Daniels and Harrison also orchestrated filings with the Commission that, while announcing Fan's appointment as an officer in the three companies, failed to disclose his complete ownership and takeover of the companies.  [*Id.*, ¶57].

### D.  Harrison's Opinion Letters

As the next step in the process, Daniels and Harrison then assisted Fan with the

critical steps of removing restrictive legends and depositing the shares with broker-dealers. Harrison provided a series of false legal opinion letters to effectuate those steps. [*Id.*, ¶66]. Harrison repeatedly signed opinion letters to a transfer agent stating that shares in Dinello/AF Ocean, TTB/Ibex, Court/ChinAmerica, and Wallbeds/Sichuan were unrestricted because: Fan or his designees had bought Form S-1 shares in private transactions, without involvement of the company; the friends and family shareholders were not controlled by the companies or anyone acting on behalf of the companies; or that the friends and family shareholders were not affiliates of the companies. [*Id.*, ¶¶67-70]. Harrison knew these statements were false as she actively participated in arranging the sale of shares to Fan or his designees, and knew the friends and family shareholders were the same for all four companies and acted at either her or Daniels' express instructions. [*Id.*].

### E.  Open-Market Trading

Daniels and Fan traded the four companies' stock in the open market at artificial prices.  At various times from 2011 through 2014, Daniels, Fan, and Bradaick all engaged in manipulative, matched trades to walk the Dinello/AF Ocean price up from a few pennies a share to as high as $1.35 a share. [*Id.* ¶¶72-74].  For example, in early January 2014, following a press release announcing a $1 million consulting agreement for Court/Chin America, Daniels orchestrated trading among himself, Fan, and Bradaick to increase that company's share price from 25 cents a share to $1. [*Id.* ¶75].  In late 2013, Daniels directed Bradaick to sell her TTB/Ibex shares and told her at what price to sell. [*Id.* ¶76].

In mid-2014 as relations with Fan cooled, Daniels worked with Bradaick to deflate the Harrison/Daniels Companies' stock prices.  For example, on May 5, 2014, Daniels and

Bradaick executed a matched trade in Court/ChinAmerica stock at 55 cents per share – down from Fan's previous trade at $1.50 per share.  On April 29, 2014, Daniels drove the price of Dinello/AF Ocean down from $1.35 to 32 cents a share.  [*Id.* ¶78].  Having proven his point, Daniels then engaged with Fan in manipulative trading to reverse the price decline.   On May 13, 2014, Daniels and Fan (in a designee account) each purchased Dinello/AF Ocean shares – both at the market open at the price of 50 cents per share, and Daniels later in the trading day at 77 cents per share.  The next day, two matched trades between Fan's designee accounts were made at $1 per share.  [*Id.*, ¶79].

### F.  Payment To Daniels And Harrison

Fan paid Daniels and Harrison as a consultant and legal counsel, respectively, for the Harrison/Daniels Companies, except for PurpleReal.  Dinello/AF Ocean paid Daniels and Harrison monthly fees of up to $12,500 and $7,500, respectively, for the fraudulent work of creating and maintaining Fan's public companies.  [*Id.* ¶64].  Daniels directed Fan and AF Ocean to pay the monthly $12,500 fee due him to 5 Dogs.  In 2013 and 2014, this included $12,500 payments from AF Ocean to 5 Dogs on April 29, 2013; June 1, 2013; July 1, 2013; August 1, 2013; September 2, 2013; October 1, 2013; November 1, 2013; December 2, 2013; January 2, 2014; February 3, 2014; March 1, 2014; and April 1, 2014, respectively.  Daniels had this money sent to 5 Dogs for the fraudulent actions he took on behalf of the four Harrison/Daniels companies, including drafting and signing false and fraudulent registration statements, periodic Commission reports, and Forms 211, as well as manipulative and illegal trading.  [*Id.* ¶65].

### G.  PurpleReal

PurpleReal was Daniels and Harrison's last vehicle, which they developed independently of Fan.  Here, Daniels and Harrison concocted a purported business plan instead of acquiring a local business.  They purchased all the issued shares of PurpleReal, put those shares in the names of friends and family through false subscription agreements, and filed a Form S-1 as a purported secondary offering by those shareholders.  Both the Form S-1 and a subsequent Form 211 application to have PurpleReal publicly quoted were full of misrepresentations about the purported business plan, shareholders, capitalization, and management of PurpleReal.  [*Id.* ¶¶81-84].

### H.  The Mirman-Rose Shell Factory

Separately, Harrison participated in a scheme with Alvin Mirman and Sheldon Rose in which Mirman and Rose manufactured at least 11 undisclosed "blank check" companies for sale by reverse merger with a deceptive public float of purportedly unrestricted securities (the "Mirman/Rose Companies").  [*Id.* ¶¶11, 85-100].  Harrison acted as Mirman and Rose's primary attorney in furtherance of the scheme.  Harrison prepared at least 21 legal opinion letters falsely claiming shares in the companies had been validly issued and were unrestricted, all at the direction of and for the primary benefit of Mirman and Rose.  With the participation and substantial assistance of Harrison, Mirman and Rose sold nine of the Mirman/Rose Companies.  [*Id.* ¶¶12, 85-100].

From September 2010 until June 2014, Mirman and Rose retained Harrison to provide, among other things, nine Form S-1 opinion letters and 12 opinion letters as to the purportedly unrestricted nature of the Mirman/Rose Companies' stock shares.  [*Id.* ¶¶87-

100].  Harrison ignored a number of red flags in issuing the Form S-1 opinion letters stating that the Mirman/Rose Companies' shares were validly issued. [*Id.* ¶¶89-94].  For example, in December 2011, Mirman sent Harrison an email that made it clear that he and Rose were setting the offer prices, not each company's Board of Directors as required by law. [*Id.* ¶93].  Harrison also ignored the fact that the offerings were the same small size ($30,000) for companies with far larger operating budgets and different sole officers purportedly in different lines of business.  [*Id.*].   She also ignored that the shareholders were the same for many of the companies.  [*Id.* ¶¶95-100].

From September 2012 to March 2014, Harrison submitted 12 opinion letters to DTC, transfer agents, and buyers as to the unrestricted nature of the securities of the Mirman/Rose Companies.  [*Id.* ¶95].  Harrison ignored similar red flags as to these letters and also ignored repeated warnings signs that the shareholders were operating under the strict control and direction of Mirman and Rose, which would have prohibited the shares from being unrestricted when Harrison wrote her opinion letters.  [*Id.* ¶¶95-100].

### III.   Memorandum of Law

### A.  The Court Should Order Harrison And Daniels To Disgorge Ill-Gotten Gains

Disgorgement is designed to deprive a wrongdoer of his or her unjust enrichment. *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014 (1988).  Courts are empowered to order wrongdoers to disgorge the amount of their profits from the wrongdoing.  *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 735 (11th Cir. 2005).  The

Commission is entitled to disgorgement "upon producing a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004).  The Commission's burden for showing "the amount of assets subject to disgorgement…is light…Exactitude is not a requirement.'" *ETS Payphones, Inc.,* 408 F.3d at 735.  Further, a defendant's financial situation, or any financial hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Here, the Court should order Daniels to pay disgorgement of $153,480, and Harrison to pay disgorgement of $88,500, representing the ill-gotten proceeds of their violations of the federal securities laws.[1]  With regard to Harrison, the $88,500 comes from the monthly checks for fees she received from Dinello/AF Ocean from April 2013 through April 2014.  As set forth in the accompanying Declaration of Stuart Soffian, attached as Exhibit A, Harrison received 13 checks from Dinello/AF Ocean between April 29, 2013 and April 4, 2014, the majority of which Harrison herself signed in her capacity as an officer of Dinello/AF Ocean.  Exhibit A at ¶¶10-11 and Exhibits 4-5.  Those checks, all deposited into one of Harrison's business bank accounts, total $88,500.  *Id.*

---

[1] Daniels and Harrison received additional compensation from 2011 until April 2013, but in light of the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), which imposed a five-year statute of limitations on disgorgement recovery, we are only seeking disgorgement of the ill-gotten gains Harrison and Daniels received within five years of the filing of the complaint, from April 25, 2013 through August 2014.  Furthermore, the Supreme Court has agreed to decide the issue of district court's authority to order disgorgement in *SEC v. Liu,* 754 F. App'x 505 (9th Cir. 2018), *cert. granted sub nom. Liu v. SEC,* 2019 WL 5659111 (U.S. Nov. 1, 2019) (No. 18-1501).  However, this court remains bound by Eleventh Circuit precedent upholding disgorgement as a remedy unless and until "clearly overruled by the Supreme Court." *Inversiones y Procesadora Tropical Inprotsa, S.A. v. Del Monte International GMBH*, 921 F.3d 1291, 1301 (11th Cir. 2019); *SEC v. Team Resources Inc.*, No. 18-10931, 2019 WL 5704525, *1 (5th Cir. Nov. 5, 2019) (adhering to circuit precedent notwithstanding grant of certiorari in *Liu*).

As set forth in the Amended Complaint, the allegations of which are deemed admitted for purposes of this motion, those checks represented payments from Fan to Harrison for the entirety of her work in the fraudulent scheme of creating and maintaining the Harrison/Daniels Companies in violation of the federal securities laws.  Amended Complaint at ¶64.  Specifically in the 2013-14 time frame that work included filing false and misleading periodic reports with the Commission, assisting Fan with the sale of at least one of his public companies in 2014 by, among other things, drafting false and misleading deal documents, and drafting false and misleading legal opinion letters regarding the Harrison/Daniels Companies' shares being free-trading.  *Id.* at ¶¶53, 54, 59, 69, and 70.

It is appropriate for the Court to include Harrison's compensation from Fan as disgorgement, because the payments were in furtherance of the entire fraudulent scheme, as set forth in Section II above and the specific paragraphs of the Amended Complaint listed in the prior paragraph.  *SEC v. Merchant Capital, LLC*, 486 Fed. Appx. 93, 96 (11th Cir. Aug. 7, 2012) (unpublished, per curiam) (affirming District Court decision to order defendants to disgorge their salary as ill-gotten gains because salaries earned were derived from improper fees and therefore constituted ill-gotten gains, and stating "there is no reason why salaries earned cannot be used to determine disgorgement"); *SEC v. Huff,* 758 F. Supp. 2d 1288, 1359-60 (S.D. Fla. 2010) ("the rationale behind the equitable remedy of disgorgement allows for broad consideration of all of a defendant's wrongful conduct in connection with the violation of the securities laws" and ordering disgorgement of all funds the defendant received as a result of his extensive fraud).

Daniels' disgorgement figure is appropriate for the same reasons.  The Commission

seeks disgorgement of monthly $12,500 consulting fees Daniels directed be paid from Dinello/AF Ocean to 5 Dogs from April 29, 2013 through April 1, 2014 (a total of $150,000). Soffian Affidavit, Exhibit A, at ¶¶5-6 and Exhibits 1-2; Amended Complaint at ¶¶64-65. As with Harrison, these fees represented monthly payments for all of Daniels' activities in perpetuating the fraudulent creation and maintenance of the Harrison/Daniels Companies. Amended Complaint at ¶¶64-65. Specifically in the 2013-14 time frame, these activities included work on the false and misleading Form 211 filings with FINRA, false and misleading annual, quarterly, and other periodic filings by the Harrison/Daniels Companies with the Commission, and creating false and misleading documents in connection with the sale of one of Fan's companies. *Id.* at ¶¶49-54 and 59. It is appropriate for the Court to order Daniels to disgorge all of the listed payments because all of Daniels' work for Fan was in furtherance of the fraudulent scheme.

The Commission also seeks an additional $3,471 from Daniels in trading profits from the purchase and sale of Dinello/AF Ocean and Court/ChinAmerica stock in 2013 and 2014. The Amended Complaint alleges several instances of Daniels engaging in manipulative trading with Bradaick and Fan to walk up or down the price of those companies' stock. *Id.* at ¶¶71-80. The results of those trades (within the five-year time limit for disgorgement) are captured in the Soffian Affidavit, which examined Daniels' brokerage account records in 2013 and 2014. Exhibit A at ¶¶7-8 and Exhibit 3. Those records show Daniels made a profit from his manipulative trading in 2013 and 2014 of $3,471. *Id.* The Court should order Daniels to disgorge those profits as ill-gotten gains.

The total disgorgement the Court should order Daniels to pay as a result is

$153,471.  Soffian Affidavit, Ex. A at ¶9.

## B.  Prejudgment Interest

In addition to ordering disgorgement, the court should order prejudgment interest, "which helps assure that defendants do not profit from their fraud."  *SEC v. Cook*, Case No. 1:13-cv-01312, 2015 WL 5022152, (S.D. Ind., Aug. 24, 2015).[2]  Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity.  *SEC v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996)*.*  A defendant's wrongdoing justifies awards of prejudgment interest in accord with the doctrines of fundamental fairness.  *Tome*, 638 F. Supp. at 639.  In Commission cases, prejudgment interest on disgorgement amounts generally is calculated based on the IRS underpayment rate, i.e., the delinquent tax rate as established by the Internal Revenue Service, IRC § 6621(a)(2), and assessed on a quarterly basis.  *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1476 (2d Cir. 1996); *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007); *Huff*, 758 F. Supp. 2d at 1364 ("courts have adopted the underpayment rate without controversy . . . that rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from" the fraud).

Using that rate, the Commission's prejudgment interest calculator shows the prejudgment interest on Harrison's $88,500 disgorgement to be $11,968, calculated from August 31, 2014 (the date provided in the consent) until April 30, 2018 (the date agreed on in  mediation  stemming  from  when  the  Commission  first  discussed  settlement  with

---

[2]  The decision of whether to impose prejudgment interest is within the Court's discretion.  *SEC v. Carillo*, 325 F.3d 1268, 1273 (11th Cir. 2003).

Harrison and Daniels shortly after filing the original complaint).   Exhibit B, Harrison Prejudgment Interest Report (run by the undersigned).  Daniels' prejudgment interest using the same calculator and the same beginning and end dates for disgorgement of $153,471 is $20,754.   Exhibit C, Daniels Prejudgment Interest Report.   The Court should therefore order Harrison to pay $11,968 and Daniels $20,754 in prejudgment interest.

### C.  Civil Penalties

The Commission seeks civil penalties of $200,000 each against Daniels and Harrison for their conduct within five years of the Commission filing the complaint.[3]  Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities law violations.  *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2014). Courts have looked to the following general factors when imposing penalties under the civil penalty provisions of the securities laws:

> (1) the egregiousness of the violations at issue, (2) the defendant's scienter, (3) the repeated nature of the violations, (4) a defendant's failure to admit to their wrongdoing; (5) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (6) a defendant's lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to the defendant's demonstrated current and future financial condition.

*Huff,* 758 F. Supp. 2d at 1365.

Section 20(d) of the Securities Act of 1933 ("Securities Act") and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") (collectively "Acts") authorize three tiers of civil monetary penalties against violators.  *SEC v. BIH Corp.*, No. 10-cv-577, 2014 WL 7057748 at *2 (M.D. Fla. Dec. 12, 2014); 15 U.S.C. § 77t(d); 15 U.S.C. §

---

[3] In *Gabelli v. SEC*, 568 U.S. 442 (2013), the Supreme Court limited the time period in which the Commission could seek civil penalties to within five years of the filing of a complaint.

78u(d).  First-tier penalties apply to any violation of the Acts.  *Id*.  Second-tier penalties apply to violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."  *Id*.  Finally, third-tier penalties apply to any violation satisfying the second-tier criteria that also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id*.

As discussed below, third-tier penalties are appropriate here.  The third tier for misconduct in the 2013-2014 time frame provides for up to (i) a $160,000 civil penalty for an individual defendant for each violation of the securities laws, or (ii) the gross pecuniary gain to the individual defendant as a result of the violation.[4]

Courts have determined that a violation occurs each time a defendant acts to violate the securities laws.  *SEC v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001), (four penalties where the defendant made four separate sets of misrepresentations); *Huff,* 758 F. Supp. 2d at 1366 (third-tier maximum penalty (at that time) of $100,000 for each of the defendant's six false SEC filings, thus resulting in a $600,000 penalty); *SEC v. Lazare Indus.*, 294 Fed. Appx. 711, 2008 WL 4406340 at *3 (3rd Cir. Sept. 30, 2008) (unpublished, per curiam) (upholding District Court order finding each unlawful sale of stock a separate violation and ordering the maximum $100,000 penalty for each of five violations to arrive at a $500,000 civil penalty).

Given the fraud violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, the Commission seeks third-tier penalties of $200,000 each against

---

[4]  The figures are taken from the Federal Civil Penalties Inflation Adjustment Act of 1990, which adjusted the potential penalty amounts to account for inflation based on violation dates.  17 C.F.R. §§201.1001-1005.  *See also* Commission Release Nos. 33-10604, 34-85118.

Daniels and Harrison.  As discussed in detail in Section II, Daniels' and Harrison's violations involved fraud, deceit, and manipulation.  They carried out a fraudulent scheme over several years to create a series of public shell companies by going to great lengths to give the appearance that these were legitimate businesses with independent shareholders, when in reality the opposite was true.  They repeatedly lied in public filings with the Commission and in applications to FINRA and DTC.

As further set forth in the Amended Complaint, a key component of the scheme was manipulative trading by Daniels to drive up or down the price of the Harrison/Daniels Companies' stock.  Amended Complaint at ¶¶71-79.  This manipulative trading caused innocent public investors to lose money.  *Id.* at ¶80.  These facts, deemed admitted by Daniels and Harrison, satisfy the standard for a third-tier penalty.  *SEC v. K.W. Brown*, 555 F. Supp. 2d 1275, 1314-15 (S.D. Fla. 2007) (third-tier penalties appropriate in cherry-picking trading scheme where investors suffered losses); *Huff*, 758 F. Supp. 2d at 1366 (court may (and did) impose third-tier penalty where the Commission shows substantial risk of loss, regardless of whether there is direct evidence of loss).

### *1  A $200,000 Penalty Is Appropriate Against Harrison*

The Court should impose a $200,000 penalty against Harrison under the seven factors set forth above.  As a threshold matter, as discussed in the preceding section, the Court is not limited to one third-tier penalty for the entire scheme.  Rather, the Court could impose a penalty for each of her violations of the securities laws, which occurred every time Harrison drafted, edited, or signed a fraudulent legal opinion letter, Form S-1 filing, or periodic Commission filing.  *K.W. Brown*, 555 F. Supp. 2d at 1314-15 (Court could

have imposed a third-tier penalty for each of the 46 months that defendants' fraudulent trading scheme caused investor losses).

Even for the limited time frame of April 2013 through August 2014, the Amended Complaint shows Harrison participated in: drafting and filing a false and misleading Form S-1 for PurpleReal with the Commission (Amended Complaint at ¶¶81-83), helping prepare and file a false and misleading Form 211 application for PurpleReal with FINRA (*Id.* at ¶84); *22* separate false and misleading Forms S-1 and periodic quarterly and annual reports with the Commission for TTB/Ibex, Court/ChinAmerica, and Wallbeds/Sichuan (*Id.* at ¶54); at least three false and misleading legal opinion letters for the Harrison/Daniels Companies (*Id.* at ¶¶69-70); and at least nine false and misleading legal opinion letters for the Mirman/Rose Companies (*Id.* at ¶92 Chart A and ¶95 Chart B).  The Court could impose up to a $160,000 penalty for *each* of these 36 securities law violations.  Thus, $200,000 is towards the bottom of the range of penalties the Court could impose.

As to the seven factors, virtually all of them support a $200,000 penalty.  The 36 violations in the preceding paragraph along with all of the admitted allegations of the Amended Complaint show the egregiousness of the violations as well as their repeated nature (the first and third factors).  Even within the statute of limitations for penalties, Harrison's acts spanned 16 months and involved at least three dozen false and misleading public filings and legal opinion letters.  Harrison's actions were specifically designed to conceal the truth about the Harrison/Daniels and Mirman/Rose companies – that they were shell vehicles for herself, Daniels, and Mirman and Rose to make money.

These actions also demonstrate a high degree of scienter on Harrison's part.

Further showing her scienter is the Expert Report of Robert B. Robbins, attached as Exhibit D.  The Commission retained Robbins, a veteran securities attorney well-versed in the process of taking companies public, during discovery in this matter to opine on whether Harrison's actions violated the standard of care of a reasonable securities attorney.[5]  As the attached report explains in great detail, Harrison violated her duty of care as a securities attorney throughout both the Harrison/Daniels and Mirman/Rose Companies' schemes by preparing, editing and filing all of the false and misleading Forms S-1, periodic quarterly and annual reports, and legal opinion letters.  Among other things, Robbins concluded, Harrison ignored numerous obvious red flags that the companies were shams – such as the identity and number of shareholders, the control exhibited either by Daniels or Mirman and Rose, and the fact the companies all were sold and business plans discontinued within a few months of becoming public.  As an attorney purportedly trained in the securities laws, Harrison knew better, and her deliberate disregard of obvious red flags that she was participating in two fraudulent schemes shows her high degree of scienter.

As to the fourth factor, Harrison has never admitted wrongdoing.  She has repeatedly denied the allegations against her, and in her consent to the judgment arrived at through mediation, she neither admitted nor denied the allegations of the Amended Complaint (except for purposes of this motion).  As discussed above, her conduct created losses for some investors and a risk of substantial losses for others, the fifth factor.

The sixth and seventh factors are neutral.  Harrison produced documents and

---

[5] The Commission provided this report to Harrison and Daniels on January 11, 2019, pursuant to the deadlines in the Case Management and Scheduling Order.  DE 43 and 44.  Harrison and Daniels did not attempt to depose Robbins prior to the July 31, 2019 discovery cutoff.

appeared for investigative testimony when subpoenaed.  However, she answered "I don't recall" literally hundreds of times throughout her testimony, including to obvious questions such as whether she had written recent letters that contained her signature.  And while Harrison has throughout the litigation claimed she has little or no money, she has not produced any financial documentation to support that claim. Overall, Harrison's repeated and egregious misconduct easily supports the $200,000 third-tier penalty the Commission is seeking.

### 2  A $200,000 Penalty Is Appropriate Against Daniels

The seven factors likewise support the requested $200,000 civil penalty against Daniels.  The allegations of the Amended Complaint set forth in Section II above show Daniels orchestrated the entire fraudulent scheme surrounding the Harrison/Daniels Companies – which ran for four years, and encompassed five separate companies, dozens of false and misleading filings with the Commission, FINRA, and DTC, and repeated instances of manipulative trading.  Daniels directed the actions of his wife, Bradaick, and the broker-dealer who filed the Forms 211 with FINRA, among other things.

Like Harrison, even within the period under *Gabelli* for which the Commission can seek a penalty, April 2013 through August 2014, the record is replete with multiple instances of Daniels' violative conduct.  Amended Complaint at ¶¶48 (misrepresentations in Form 211 process with FINRA for TTB/Ibex); 51 (same); 52 (more misrepresentations to FINRA to get Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan publicly quoted); 53-54 (misrepresentations in at least 22 Commission filings in 2013 and 2014); 57 (misrepresentations in Forms 8-K filed with the Commission regarding Wallbeds/Sichuan);

59 (misrepresentations in Commission filings regarding the sale of Wallbeds/Sichuan); and 74-79 (manipulative trading in 2013 and 2014).  The Court could impose up to a $160,000 penalty against Daniels for each of these numerous violations, again demonstrating the $200,000 penalty the Commission seeks is towards the lower end of the range.

The violations in the preceding paragraph along with all of the admitted allegations of the Amended Complaint show the egregiousness of Daniels' misconduct as well as its repeated nature (the first and third of the seven factors set forth above).  Daniels' actions spanned 16 months within the period for which the Commission can seek penalties, and involved continuing acts to attempt to deceive regulators and the marketplace into believing that the first four Harrison/Daniels Companies were legitimate businesses with independent shareholders and management, when in truth they were shell companies with one purpose – to earn Daniels and Harrison profits.

These actions also demonstrate Daniels' high degree of scienter.  In addition, throughout the scheme, not only did he undertake a comprehensive plan to subvert the public company registration process, he bragged about his acumen in illegal activity to Fan and others.   Amended Complaint at ¶¶7 (he uses "friendly" shareholders who will cooperate in the process); 37 ("my business model is the best . . . it does not carry 'shell' problems and they are always DTC eligible and clean" and "I am considered one of the best at what I do . . . so that a person does not get labeled as a 'shell' mill"); and 40 ("all of the shareholders are friendly and we have used them many times in the past so we will have no problems in the future").

Further demonstrating Daniels' scienter is the fact that he is familiar with the

securities laws; in fact, this is not the first time he has faced securities law charges.  In 1999, he pled guilty to conspiracy to commit securities fraud and was sentenced to six months home confinement, three years of probation, 100 hours of community service, and a $3,000 fine.  *U.S. v. Daniels*, Case No. 99-cr-00408 (D. Nev.).  The information in that case alleged that, as in this case, Daniels prepared fraudulent documents to file in Nevada state court to facilitate the transfer of otherwise restricted stock.  Exhibit E.

As to the fourth factor, Daniels has never admitted wrongdoing.  As the Court is aware, Daniels has repeatedly denied the allegations against him and filed numerous pleadings baselessly alleging misconduct on the part of the Commission for investigating and suing him.  As with Harrison, in his consent to the judgment arrived at through mediation, he neither admitted nor denied the allegations of the Amended Complaint (except for purposes of this motion).  As to the fifth factor, as discussed above, Daniels' conduct created losses for some investors and a risk of substantial losses for others.

The sixth factor, a defendant's lack of cooperation and honesty with authorities, if any, also weighs in favor of a penalty.  When the Commission staff lawfully subpoenaed Daniels to appear for testimony in 2017, his response was to leave a telephone message flat-out refusing to appear and saying he would only do so if ordered to by a court in Tampa.  Exhibit F.1, Commission's Application For An Order Enforcing Administrative Subpoena, at ¶¶3 and 14.  Daniels did not respond to further attempts to communicate with him and did not appear for testimony, forcing the Commission to go to the time and expense of seeking a court order compelling him to appear.  Exhibit F.1.  After Daniels responded to the application, he subsequently refused to appear at a hearing, and a District

Judge in the Southern District of Florida granted the Commission's application and ordered Daniels to appear for testimony.  Exhibits F.2 and F.3.  It was only then that Daniels complied with the subpoena.    Clearly Daniels displayed a lack of cooperation with authorities, a factor the Court should consider in deciding what penalty to order.

The seventh factor is the same for Daniels as Harrison.  Although he has throughout the litigation claimed he has no money, he has not produced any financial documentation to support that claim. As a result, the seven factors – primarily Daniels lengthy, repeated, and egregious misconduct – overwhelmingly support the $200,000 third-tier penalty the Commission is requesting.

### IV.  Conclusion

**WHEREFORE**, the Commission respectfully requests the Court enter Final Judgments as follows: against Daniels for disgorgement of $153,471, prejudgment interest on disgorgement of $20,754, and a civil penalty of $200,000; and against Harrison for disgorgement of $88,500, prejudgment interest on disgorgement of $11,968, and a civil penalty of $200,000.

Date:  May 18, 2020

<div style="margin-left:40%">

By:     s/Robert K. Levenson
        Robert K. Levenson
        Senior Trial Counsel
        Fla. Bar No. 0089771
        Telephone: (305) 982-6341
        Facsimile: (305) 536-4154
        E-mail:  Levensonr@sec.gov

        ATTORNEY FOR PLAINTIFF
        SECURITIES AND EXCHANGE COMMISSION
        801 Brickell Avenue, Suite 1800

</div>

Miami, Florida 33131
Telephone: (305) 982-6300

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 18, 2020, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on

the attached Service List in the manner specified, either via transmission of Notices of

Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronically Notices of Electronic

Filing.

s/Robert K. Levenson
Robert K. Levenson, Esq.

## SERVICE LIST

Michael J. Daniels
6719 Bobby Jones Court
Palmetto, FL 34221
*Pro Se*
Via Overnight Delivery

Diane J. Harrison
6719 Bobby Jones Court
Palmetto, FL 34221
*Pro Se*
Via US Mail and Email